Good morning. I'd like to reserve about three or four minutes for rebuttal. If this court allows the lower court's decisions in this case to stand, two things are going to happen. First, Crown's unpaid, unsecured creditors will not receive any portion of $3.2 million that otherwise would have been paid to them for debts owed to them by Crown. And second, Crown's plan participants will receive $3.2 million more in benefits than they were promised under the plan. And third, Crown's decision, the Bankruptcy Court's ruling upon which this result rests, that is, that Crown's failure to adequately consider the merger proposal from Pace constitutes a breach of fiduciary duty, was legally erroneous for two separate reasons. The first reason is that Crown's decision not to merge was not a fiduciary act and, therefore, cannot be construed as a breach of fiduciary duty. The reason for this is that a decision whether to merge Pace's merger or not merge is a decision concerning a modification to the form or structure or design of the plan. And the Supreme Court's ruling in the Hughes Aircraft case tells us that a decision to modify or amend a plan or to alter its form or structure is a settler function. It is not a fiduciary function of a plan administrator. In fact, in the Malia case from the Third Circuit, the Third Circuit expressed and expressly held that an employer's efforts to merge two pension plans does not invoke the fiduciary provisions of ERISA, precisely because they decided to terminate the plan, and then they were trying to assess what to do. Yes, they decided to terminate the plan, but a decision to merge the plan is always a settler function, and it doesn't matter whether it comes up after the decision to terminate or before. The only way the decision to terminate could have been to terminate the plan,  Once they decided to terminate the plan, they were free, their decision on what to do with the funds or how to protect beneficiaries was not a fiduciary? It was a fiduciary duty, but when the merger proposal came in, the only way that could have been accepted was for the plan's sponsor to undo its termination decision and say, no, instead we'll do a merger. So ultimately, this argument merges into your argument that you can't terminate by merger. I don't think it does merge into the argument, Your Honor. Why not? Because you just said that you would have to undo the termination. If you didn't have to undo the termination, if it was simply a way of implementing the termination, then it would be subject to the rule that the way that you implement termination is subject to fiduciary duty. I understand the Court's point, yes. I think, better put for me, there are two different ways of looking at it, but probably come to the same conclusion. Unless we accept your conclusion that you can't terminate by merger, then this point falls away. I actually don't think you get to the point that you can't effectuate a termination by merger if you accept the point that a merger is always a plan sponsor function and is never a plan administrator function. Where are you getting that from? Excuse me? From whence are you getting that conclusion? I get that conclusion from the Malia case, Your Honor. That case didn't involve a situation where somebody was trying to terminate by merger. No, it did not. No, it did not. What's the second? The second is the one that Judge Berzon just referred to, and that is neither ERISA nor Crown's plan authorized the plan administrator to effectuate a termination through a merger. Now, the argument about the plan, you didn't raise it in the bankruptcy court. Isn't that correct? It was raised in the bankruptcy court in the reply brief, Your Honor. In the bankruptcy court or in the district court? Excuse me? In the district court. You didn't raise it in the bankruptcy court. I wasn't in the bankruptcy court, Your Honor. I don't believe. I'm sure you were. Surely did. And surely you know it wasn't raised in the bankruptcy court. It wasn't raised in the bankruptcy court. Yes, Your Honor, you're absolutely correct. Was it raised in the blue brief or on the opening brief or before the district court? It was not. Was it raised in the reply brief? It was not. But I would point out, Your Honor, that Pace. We're reviewing the grant of a preliminary injunction here. Yes, you are. Are we or didn't we stipulate that this would be the permanent? Well, you're correct, and Judge Paez is correct. All right. The district court said it was affirming a preliminary injunction, and we're appealing from the district court's ruling. But the reality is the record that went to the district court was a record on an appeal from a final judgment. Was there a final judgment in it? Yes, Your Honor. Where? It's part of tab 5. Part of tab 5. In the third volume, and it's found at pages 414. Joint statement. That's the joint report. That was so ordered. Does it say that it's a judgment on the merits, or did it just say that you're agreeing to the preliminary injunction? It says that the at page 415 that the preliminary injunction was stipulated by the parties to be final decision. Well, is it a final decision on the preliminary injunction, or is it a final decision on the merits of the whole claim? Well, we construed it as a final decision on the merits of the whole claim. But for purposes. Where is the separate judgment, though? That is. There was no separate. There was no document. Yes, there was. Well, yes, there was, Your Honor. I believe there was. Which was entered by the district court? Excuse me? Which has been entered by the district court. By the bankruptcy court. Bankruptcy court. There were two orders signed on February 5th and entered on February 14th. Under the order that when the district court granted a preliminary injunction, he contemplated, the court contemplated further proceedings. There were. To decide what to do. Yes. Did the bankruptcy court ever make a final decision about how the funds were going to be utilized? Yes. And what was the final decision? The joint report. Which says that the money is going to be distributed among the beneficiaries? Yes. Not actually as benefits. It doesn't say that. Right. It doesn't say as benefits. It says that the contributions, the first thing that will happen is the contributions made, if any, by members of the plan will go back to them, which is something ERISA requires anyway. And the rest of it will be distributed pro rata to plan participants. That's what it says. So there was no further, so once that was signed, there was nothing further for the bankruptcy court to do in this? I believe that's correct, Your Honor. I really do sense the court's asking questions about jurisdiction, and I think there are really three. No, no, no. Oh. Is that a permanent injunction or are we reviewing? You both agree, I assume, that this is permanent. This was it. This is the final decision of the court. Yes, Your Honor. Whatever papers there are, that's the agreement, the understanding you both have. That's what the record shows to this court. Yes, Your Honor. I believe that's correct. All right. As I was starting to say, the statute, of course, doesn't say specifically that a termination can be effectuated by a merger. But it says it can be effectuated by distributing in other ways consistent with the plan. It says either through the payment of an annuity or in accordance with the plan provisions in a way that otherwise fully satisfies payment of plan liabilities. Yes, Your Honor. That's Section 1341B3A2. So why can't it be done by merger? So why can't it be done by merger? Because that would not be in accordance with the plan provisions, Your Honor. Well, let's skip that for a minute. We have a ñ that's ñ but if it were, it could be? Yes, I think it could be. Your argument was otherwise. Your argument in the brief is certainly otherwise. My understanding of your argument in the brief is that a merger, a termination by merger is just not a possibility. Your Honor, this gets back to the conversation you and I had a few moments ago, which is I think that a merger cannot be a fiduciary function. Partly a construction of the termination statute, as I understood it. But you're now ñ that argument is now by the boards, and now your argument is based on the plans, is that it? Your Honor, I just am not willing to concede that. I know you're trying to ask me to say that. I'm not. I thought you just did. I was quite surprised, actually. I thought that the core of your argument was that you don't distribute when you merge. And I was trying to get you to discuss that, but you said a minute ago that you can have a termination by merger. Your Honor, if I said what you think I said, I misspoke, and I would like to withdraw that comment. Yes, we do argue in our brief that a merger is not a distribution. You're absolutely right. And we don't believe it is. A merger is a combination and an assumption of liabilities, but it's not a distribution. Frankly, I thought we made that point clearly enough in our briefs that I wasn't going to reemphasize it here this morning, but I don't by any means mean to be withdrawing that argument. I think it's a sound argument. What I was about to address is that the plan does not provide that a termination can be accomplished via a merger. Well, aside from the waiver issue with the plan, what does the plan say? The plan says in Section 12.4 that a distribution of assets pursuant to a merger may be effectuated in three ways, and it says it in very direct language. One is through the purchase of an annuity. Two is by continuing the plan in existence. Okay. What does that mean? That means that's a good question, Your Honor. I don't know what it means. I've wondered that myself. I wish I had an answer for that one. How about, for instance, by a merger? Excuse me? How about, for example, by a merger? That cannot work, Your Honor, because in a merger, as the Court knows, there's a disappearing plan and a surviving plan. If there's a disappearing plan, it doesn't continue in existence. So that much I do know. It must mean something. I mean, it could be. I don't think there's ever been a hearing on any external evidence because you didn't raise it in the bankruptcy court, but it certainly could be that this was a, you know, perhaps slightly inartful way of saying by continuing, in effect, some plan. I just can't see that, Your Honor, because when there's a merger, there's not a continuance of the plan. It disappears. Otherwise, you're just reading the language out of the plan altogether. I'm not reading it out, Your Honor. I unfortunately cannot answer your question what it means, but it cannot mean merger, because when there's a merger, the plan disappears. It doesn't continue. And that's just standard merger law. I want to point out to the Court that Pace had the burden of demonstrating that it was possible, in accordance with the provisions of the plan, to terminate the plan through a merger. It didn't put the plan into evidence in the trial court. And it's true that we didn't raise this issue ourselves until the district court proceeding, but the burden was on the union. And so you didn't raise it, then. Nobody raised it, apparently. But the burden wasn't on the union. But now you're saying that the district court was clearly wrong as a result of this. Or the bankruptcy court. I'm sorry. I'm saying the bankruptcy court was clearly wrong. It erred as a matter of law, yes. I am saying that. Do you think the bankruptcy court should have had the opportunity to address it? It certainly would have been nice, wouldn't it? Sure. I think both parties should have argued it below, but they didn't. In any event, nobody's made the argument until Judge Berzon's suggestion, and I just don't believe it's correct as a matter of merger law, that the continue of the plan in existence language could possibly mean that a termination can be effectuated by a merger. What the district court ruled, as the court has read, is that Section 12.5 says that a termination may be effectuated through a merger. But that language is just far too indirect to permit that conclusion. It's just not logical to conclude that the plan's authors intended that a termination could be effectuated through a merger and then chose to say so in that kind of indirect language, which is, by the way, to me at least, very confusing, if that's what it's trying to say, rather than saying so directly in Section 12.4, where it used very direct language to mention the three ways in which a termination could be effectuated. In fact, Section 12.5 talks about a distribution. Yes. That's also what Section 1341 talks about, the section that Judge Berzon mentioned. It's called a distribution of assets pursuant to a termination. That's what Section 12.4 deals with. That's what Section 1341. Section 12, the entire section deals with amendment or termination of plan. Yes. Yes, it does, Your Honor. But Section 12.5, to get back to my point, doesn't authorize effectuating a termination through a merger. As we pointed out on our briefs, the language of Section 12.5 is simply an attempt to track the anti-dilution language of Section 1058 of ERISA. I call it anti-dilution language because what it does is it prohibits sponsors or administrators of plans, once there's a merger, from providing less benefits to a plan participant after the merger than existed before the merger. So in the event of a merger, they would go to the termination section, get their obligations under 12.5. Is that what you're saying? No. No, no. Because the plan beneficiaries are entitled to rights under a plan. Right. And when there's a merger, what they're saying is if the plan had terminated, we would know what those benefits are. It's not in Section 12, which is what I thought the Court was asking me. If that wasn't what the Court was asking me, I apologize. Well, let's just, you know, if they're considering a merger, and they want to, that is, the plan administrators, they're considering a merger, and they want to know, they want to make sure they forget the statute for a minute, but just look at the plan. They want to make sure that they understand what their obligation is to protect the benefits of the beneficiaries. They would go to Section 12. It says termination of plan, and then go down to 12.5. Right? I don't think that's the way it works, Your Honor. Because they wouldn't be terminating the plan. What they'd be trying to do is determine what the actual benefits to each beneficiary were, and you can't find that in Section 12. Is there a separate section in the plan about merger? No, Your Honor. Not that I found. It's only referenced to merger. I believe so, Your Honor. Yeah. That's right. Your Honor, I think that this language, 12.5, is tax code language. There's a counterpart to Section 1058 in ERISA. That's in Title II of ERISA. It wasn't mentioned in the briefs. The regulations pursuant to Section 401A12 were mentioned in the briefs. Section 401A12 of the tax code says that if this language is not in a plan, then it cannot be a tax qualified plan. So the language has to be there for the plan to be tax qualified. And if you look at PYUM's own plan, which is set out at Tab 8 of the Supplemental Excerpts of Record at page 40, you will see that that plan talks about mergers as well, and it has almost the identical language that's found in Section 12.5. It's there for a tax purpose, Your Honor. It's not there to say that a termination can be effectuated through a merger. But I do want to make another point, Your Honor, because I think I've exhausted this unless you have more questions about it. That is about this language. It's obviously very confusing, but I don't think it's possible to read it as allowing a termination to be effectuated by a merger. I do want to talk for a moment about the remedy. Even if merger were a way to terminate, the violation found here, that is a failure to adequately consider the merger proposal, is not remotely the type of a violation that any court has ever found warrants the equitable remedy of a constructive trust in the ERISA context. This is not a case like the Waller or the Boussian case, where the planned fiduciary tried to maximize the reversion that would be going to the planned sponsor by buying at a discount an annuity from an unstable insurance company. It's also not a case like the Amalgamated v. Murdoch case, where one of the planned fiduciaries used planned assets as leverage for his own personal gain. In fact, the bankruptcy court now ---- There is a whole reason for this, or the whole basis for this argument, bankruptcy and the fact that the company was not continuing in existence. If the company were continuing in existence, it would be analogous, would it not? It would be analogous. If the company were continuing in existence and the reversion was going to that company, would your argument be the same? It wouldn't be as strong, Your Honor, but it would be the same. It would be the same. It would be the same. Because? Because I think what the remedy would have been in that instance would not be to deprive the company of the reversion because it didn't make any misuse of assets here. It didn't risk assets. The bankruptcy court didn't find that. Bankruptcy court didn't find it misused assets. Bankruptcy court didn't find that Crown tried to use the planned assets to gain some kind of an advantage. All it was found of doing is not seriously consider a merger proposal that would have increased benefits through a possible 13th check to plan participants. But ERISA doesn't guarantee increases in planned benefits. The Hughes Aircraft case tells us that. The Brillinger case tells us that. The policy of ERISA is not at all about increases in planned benefits. It's about protecting benefits that were promised under the plan. And the case law tells us, in cases such as the Chait case and the Resolution Trust Corporation case, that in determining what kind of a remedy to grant against a fiduciary or whether a remedy is warranted at all, courts must look to see whether that remedy would best effectuate the purposes of ERISA. And this Court's Waller decision says that the purpose of ERISA, in the case of a terminated plan, is to make sure that the benefits promised to the beneficiaries are not lost to them and are paid to them. And that's not the type of thing that Crown was found of not doing. Crown, in fact, did protect those benefits. It was found liable for not considering an option that would have increased benefits. I've got 19 seconds left I'd like to reserve. For rebuttal. Yes. All right. Good morning. My name is John Plotz, and I'm privileged to represent the plaintiffs here. My co-counsel is Christian Reisner. But I will be doing the oral argument. Let me speak briefly about remedy. And the fact that you speak to me about the procedural posture of the case. Was it a permanent, was it a final, permanent judgment that was entered in this case? I believe that the opposing counsel has it right, that we want it to be a final judgment. I think that the bankruptcy court, frankly, it may have erred by not making a single document. As a judgment. I just want to clarify, that's what you want. I mean, that's the way you view it. But on February 12, 2002, there was a parties joint report. Yes. Pursuant to court's December 11, 2001 order. Yes. And in paragraph on page 2, it says on December 11, 2001, the court made findings of fact and conclusions of law, which by oral stipulation of parties became final. Yes. Yes, Your Honor. Pursuant to the December 11 order, the defendants are required to retain on blah, blah, blah. And the court also directed parties to report to the court regarding the surplus. How the surplus could be distributed. And then it goes on to the report. So from, by this oral stipulation, if you were to track that down, I guess that's in the record someplace. I believe it is. That oral stipulation provides that there was to be a final judgment. Final judgment. Yes, Your Honor. And what happened here was just that there was no. So in other words, the district court, the bankruptcy court's findings of fact and order, banning the preliminary injunction when he did it on that oral decision that he made, it was contemplated that that would be a final, the findings and judgment on the merits. Yes. And that his remedy of setting aside the money into this interest bearing account was final. Yes. So there was nothing further for the bankruptcy court to do. That is correct. Now, the district court didn't view it that way. No. Although we, it was a different counsel on the other side there. But both of us told the court that we considered this to be a final judgment. And the court, for reasons best known to itself, considered it to be a preliminary injunction. We are. Does it affect our standard of review or how we view the case if we treat it as a. Not really, Your Honor. As a grand preliminary injunction. As a. And I. I shouldn't say this as a respondent, I suppose, because we're better off if it's a, if it's just a preliminary injunction that you're reviewing. But the fact is, in all fairness to the other side, that we have, the parties have been treating this as a final judgment. We do not anticipate anything further for the bankruptcy court to do, except, you know, perhaps there might be some housekeeping in terms of enforcing the order. But we, we don't consider it to be a preliminary injunction, although it might be conceivably favorable to us to do so. You see, the last order that the district court signed on, when he actually, when the bankruptcy court signed the order, it says, good cause appearing, it is so ordered. The preliminary injunction shall remain in effect until this order is fully effectuated. Yes, until it's, until it's effectuated. That is to say, there was going to be, the, the order, the judgment, the constructive trust contemplates a distribution to participants. That has not happened. And so until that happens, the, the bankruptcy court would have some jurisdiction. In fact, the amount, the money that was put into the constructive trust has been drawn down on to pay for further benefits. So it's not. I don't want to detract you from your merits. We better get to the merits. You were going to talk about the remedy. Yes. In this case, there is a remedy of a constructive trust. That is to say, a Murdoch-like thing. Here is the sum of money, but for something you did wrong. You would not have it. The only way we can effectuate. But that isn't clear. I mean, this is what's troubling me. Your fiduciary duty claim regards the failure to investigate adequately. Yes. If they had investigated adequately, I guess there's another question that's connected to something that your opponent said. What is the fiduciary obligation? Does the fiduciary obligation go to preserving 100 percent of the benefits or preserving as much as you can? It goes to doing what a reasonably prudent person would do in like circumstances. Yes, but the question is, what is the obligation to the beneficiaries of the pension plan with regard just in general, or is it to them with regard to preserving what they were promised? It is primarily, the very first obligation is to preserve what was promised. Okay. When a fiduciary has fulfilled that and has given 100 percent, no more is required. But that doesn't. All right. So we don't know. Their claim here is that by the choice they made, they were getting 100 percent. Your claim, as I understand it, is they didn't investigate the alternative, and the alternative may have given them more, but maybe they had no obligation to get them more. And you also say it would have given them a more secure version of 100 percent, because they would have had a dispute resolution mechanism, and I'm not sure what else. But whatever it is, we don't ultimately know whether the investigation would have resulted. After a proper investigation, it would have been a breach of fiduciary duty to choose what they actually chose. Is that right? That is correct, Your Honor. That's true for every time this Court deals with a situation where, let us say, a lower court does not exercise its discretion at all. So what I'm asking you then is, in terms of the constructive trust remedy, what is your authority or your argument, if there is an authority, as to why the full constructive trust remedy lies, rather than trying to reconstruct in some way the decision-making process that should have gone on before you instigate the constructive trust? Well, actually, I have two answers to that, Your Honor. First of all, what we requested in our complaint was the appointment of an independent trustee. I'm wondering if that isn't the appropriate remedy, as opposed to actually giving out the money when we don't know what a proper fiduciary, fiduciarily proper decision would have been. The court, the bankruptcy court at the time, decided, for better or worse, that it would be undoing the – to undo the annuity would cost a tremendous penalty, which would have to be paid to Hartford. Well, that's true, but you could still have a remedy of that kind with respect to the $5 million reversion, i.e., to determine whether that $5 million reversion would have existed or wouldn't have existed. That, Your Honor, would be really, I think, a moot court exercise. It would be a hypothetical judgment, and only a hypothetical judgment, if they had done – This is a hypothetical judgment. I mean, isn't this a judgment that there would have been $5 million to distribute because they would have made the – if they made the proper decision, they would have made it this way? The – well, no, but, Your Honor, we have never claimed, we have never said that this was the only decision which was possible. They had to reach this decision. I believe they would have reached the decision. I believe an independent fiduciary would reach that decision. But it is not a question of a retrospective judgment on what an exercise in discretion would have come up with. Furthermore, Your Honor, the reason that we are in this situation, the reason we have this ambiguity, is because Crown Vantage broke its promise to the court. We went to the court before there was litigation at a time when Crown Vantage was considering purchasing an annuity, merging. How are they going to handle it? And we found that their disclosure to the bankruptcy court was inadequate from our point of view. We went to court, and the Crown Vantage said, yes, we are considering merger. Yes, we are considering purchasing annuities. We haven't decided what's happening yet, but we will come back to this court, and we will let the other side know what we're going to do before we do it, so that we have an opportunity to have our say. And by failing to do that, by making it a fait accompli, by reneging on that promise, they took $84 million and put it in a position that was where we couldn't get it back. At that point, it seems to me very ‑‑ it is not becoming of Crown Vantage to say, well, it's true that we said we were going to let you know, and we didn't. We were going to let the court know, and we didn't. But, you know, if we had done the right thing, the result wouldn't have been the same. I don't think the result would have been the same. The only result that was certain was that when the dust settled on October 8th or 9th, they thought they had $5 million. In Murdoch, is Murdoch the one case in this court which has actually had a constructive trust? Yes. All right. And in Murdoch, in fact, what the constructive trust was was of ill‑gotten profits, known to be ill‑gotten profits. Is that not right? Yes. So isn't that different? No. Well, Your Honor, one of the things that my opponent said was that they did not try to maximize the reversion here, that there was nothing improper in what was done, that the choice of this particular annuity provider was not done with the notion of advancing Crown Vantage's interest. We believe that's incorrect. When the union first approached Crown Vantage in the summer of the bankruptcy, there were 17 plans, and the Taft‑Hartley plan was willing to take all 17, knowing that some of them were underfunded because the overage of some would make up for the underage of others, and all participants would be fully protected. Crown Vantage said no. They took five of those underfunded frozen plans and said, and abandoned them. It's very simple. They abandoned them. They cherry‑picked. And they chose only ones which were ‑‑ only frozen plans which were overfunded. So that the overall scheme of Crown Vantage was let's look at these 17 plans, the ones that are underfunded, they're off these 12. I mean, you can probably get to the merits, but isn't the problem that those were not fiduciary decisions? Well, I ‑‑ I mean, this is a very strange two‑hats problem, but I understand the question of which plans to abandon and which not were made with the company hat on, not the fiduciary hat on. Well, Your Honor, that ‑‑ Yes, no, maybe. I say no. I say no. For several reasons. One is that you ‑‑ it seems to me not a reasonable state of the law that the company would choose to be, have fiduciary duties as to 12, but not fiduciary duties as to these five. But in any case, Your Honor, one of the things that has been said repeatedly by the other side in this case is that, well, you know, a decision to terminate, after all, is a settler function. We have taken the position that there was no breach of fiduciary duty in the decision to terminate. It does not follow, however, that a decision to terminate is always and only a settler function or a non‑fiduciary function. Certainly, as the general state of the law of the Supreme Court has said, that decisions to terminate, amend, change the structure, generally are non‑fiduciary decisions. But in this particular case, that happens not to be true. This particular case, the decision to amend the plan or terminate the plan is given to the plan administrator. That's Article 12, amendment or termination of the plan. The power is not given to the company. The power is not given to the settler or the plan sponsor. It is explicit that the power to terminate, the power to amend, is a plan administrator function. There is no question whatsoever, at least not in my mind, that plan administrators have to operate exclusively in the interest of the participants. That this ‑‑ no, because this was not part of the record, Your Honor, in the bankruptcy court. I'm sorry. Let me address something about that, actually, since that has arisen. The problem with not having raised this in the bankruptcy court, the problem with not having raised it even until a reply brief in the district court, is not ‑‑ it's not only a question of waiving a legal argument. It's a question of what does Article 12 even mean. The parties, Crown Vantage and the union and all the experts they hired and the bankruptcy court, everybody was working on the assumption that there was no impediment to merger in the plan documents. That was ‑‑ it is one of the rules of contractual interpretation, which we all learned in the first week of law school, is that one of the ways you can interpret an ambiguous contract, if there is indeed any ambiguity at all, is how have the parties acted on that contract over the course of time. Well, if you review the various ‑‑ this is all in the record, the conversations between the union and Crown Vantage and the correspondence between them and the positions that people took in the litigation even, if you look at all of that, everybody assumed that merger was possible. And that is the ‑‑ we still maintain that it is possible. The reading that is given by Crown Vantage is that when it says in 12.4 you can do this or this or this, that those are exclusive, which is not what it says. It just says you can do this or this or this without the further addition, and you can't do anything else. And that the very next section, 12.5, which deals with merger consolidation, that that somehow is out of bounds in case you want to do termination, which is also not what it says. But in any case, the parties have acted as though the plan documents permit merger, merger and termination, merger slash termination, however you want to put it. That's the way the parties have acted. That's what we believe this, the plan documents, mean. And we believe that the district court, although it shouldn't have considered the question at all, got it right on the merits, that merger was at least a possibility. Your argument ‑‑ we're sort of doing this whole case, so your argument is in reverse. But as to the first issue, i.e., whether or not one can terminate by merger, your answer depends on the language in the statute that says or other ‑‑ Yes. Otherwise in accordance with the plan documents. So you have no obligation at that point to demonstrate what the plan document shows? Well, it was ‑‑ actually, you know, this is the first mention I heard of that, you know, it was our burden to show that. I mean, I suppose ‑‑ I guess the answer is that we did show it. It was implicit. It is that it was implicit. Nobody ‑‑ nobody remotely suggested that it wasn't possible. But the dispute at the bankruptcy court level was whether you could do it by merger as opposed to by something else, but not whether you could do the merger. Well, I don't even remember that being the dispute. The dispute was whether they had, in fact, you know, done an investigation why they had done it. The issue of whether it complied with the plan documents was simply ‑‑ we would have put the plan document. One of the things we would have done is we ‑‑ But he says put the plan document into evidence. Well, one of the things we would have done is we would have put the whole plan document into evidence, and we probably would have put all 17 plan documents because they weren't the same. So what does that tell us? It tells us that everybody at the time believed that the plan documents, you know, were perfectly consistent with merger, which is indeed what they say. It also could have and might have introduced some extrinsic evidence. Because the language is very ‑‑ Yes, yes. I agree. We could have. If there had been a dispute. If there had been a dispute, which there wasn't. I have five seconds remaining. What kind of extrinsic evidence you might offer? Well, there were discussions between the principals, the vice president of the union and the president of Crown Vantage. To be perfectly frank, I have not reviewed with him, you know, what was said about the plan documents. And the answer is I don't know. I mean, I can take a guess, but I'm not going to take a guess against my own interests. All right. Thank you. Thank you. Your Honor, the answer to your question about what does continuing existence mean, it means this. You would freeze the plan and then pay out the benefits monthly, as you always do under a pension plan, until the last of the benefits was paid out, which could last 50 or 60 years. I'm going to terminate a plan. That's what it means is what I'm told by my ARISA partner who's sitting at council table with me. Where do you get that from? Some statutes and regulations, some opinion letter? I got it from my partner, Your Honor, because I didn't know the answer when I stood here before. That's freezing a plan, but it doesn't sound like it's terminating a plan. That's what I'm told. As far as the fiduciary duty is concerned, 1104A of ARISA says that the fiduciary duty must be performed to provide benefits and the word and is in there, in accordance with plan provisions, meaning you don't have to act to increase benefits. You have to act to provide and protect benefits. And my understanding is that there were other possible issues here as to why the proposal might have been superior, even to preserve benefits. There's nothing in the record that shows that the proposal to merge would have been superior to preserve benefits. That was never the argument. The argument was at least that they had a better dispute resolution plan, so they would have had more recourse if something went wrong. That was an argument. But I didn't read and don't read that argument as a way of protecting assets. I think the Court is right when the Court says the decision what to do with all 17 of these plans is clearly a sponsored function. They hadn't decided whether to terminate them or not yet. Well, no. Actually, Mr. Ploss is right when he says that this Section 12, very oddly, does say that it's up to the plan administrator to terminate or amend the plan. It does not say that, Your Honor. It says the plan administrator may amend the plan from time to time or terminate the plan at any time. By written resolution of its Board of Directors. Yes, Your Honor. I know the language says exactly what you said, but the key word there is may. And what the Verity case told us and what Section 1104A itself tells us is whether a function is a fiduciary function or not is determined by the function, not by the label you put on the person. So the plan administrator may have the plan administrator was the same person as the sponsor here, as the Court realizes. It was Crown. The plan administrator may terminate or amend. That's what the language says. It doesn't say she'll have the exclusive right to terminate or amend. And when one performs the function of amending a plan, one is wearing, according to the Supreme Court, the hat of a sponsor. And this language can't change that. The plan administrator, the fiduciary function, is to manage and administer the plan, not to change the plan. And this may be there for a matter of convenience, but it surely doesn't make amending the plan a fiduciary function. And it doesn't make it exclusive. Thank you, Mr. Crown. Thank you, Your Honor. The case just argued will be submitted. The next case on the calendar is Wells Fargo Bank v. Poutis.
judges: Reinhardt, Paez, Berzon